**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CSAA AFFINITY INSURANCE COMPANY a/s/o WALTER & MARY MITCHELL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No.: 1:21-cv-01543-JKB |
| v. | * | |
| | * | |
| THE SCOTT FETZER COMPANY a/k/a WAYNE/SCOTT FETZER COMPANY d/b/a WAYNE WATER SYSTEMS, | * | |
| | * | |
| Defendant. | | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS FOR
SPOLIATION OF EVIDENCE AND FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This subrogation action was filed by an insurance company that wants a sump pump manufacturer to cover the payments made to insured homeowners after a 2018 house fire. Immediately after the fire, the insurance company hired experienced experts to investigate the scene and build a plausible case that someone else negligently caused the fire should be stuck with the insurance company's loss. Several charred electrical devices were found in the burned basement. Many, like the power strip and exhaust fan, are well-known common causes of house fires. Less so for sump pumps, which are used to pump water from a pit and have comparatively little history of causing fires—despite decades of use in millions of American homes. But, in this basement, the insurance company could still identify the burned sump pump's manufacturer (but not the manufacturer of the other devices). So, in 2021, the insurance company filed this lawsuit blaming the sump pump manufacturer for selling a "defective" product whose defect purportedly caused the fire.

The claim fails for two fundamental reasons: the insurance company (1) deliberately destroyed the most important evidence in the case and (2) failed to build a competent evidence-based case that could support liability against the manufacturer under any legal theory.

First, the insurance company inexcusably destroyed the most important evidence in the case, which has robbed the manufacturer of its right to adequately defend itself. Upon learning—in 2021—that the insurance company contended that the sump pump had a defect that caused the fire, the manufacturer retained experts to conduct its own investigation. It then learned that the insurance company and its experts had destroyed the sump pump *in 2019*, a year after the fire, and destroyed the *other* electrical devices taken from the basement even earlier.

This puts the sump pump manufacturer in the untenable position of having to defend itself in an electrical basement-fire case without being able to test Plaintiff's causation theory against any of the devices from the basement. The sump pump manufacturer is left to defend itself primarily with whatever evidence that its adversary decided to not destroy. Fourth Circuit case law has repeatedly found that dismissal of the subrogation claim is the *only* fair remedy when the insurance company seeks to blame a fire on a device manufacturer but fails to preserve the evidence necessary for the manufacturer to adequately defend itself.

Second, besides destroying the crucial evidence, the insurance company has done virtually nothing to reliably substantiate its hypothesis that the sump pump had a defect that caused the fire. Its electrical engineering expert could not identify which part of the sump pump likely failed, and he did not test any sump pumps to show how they might fail or even create a fire hazard. The insurance company took no discovery from the manufacturer or its experts to flesh out whether its hazardous-defect hypothesis was borne out by the device's history and use.

The expert's *ipse dixit* testimony is inadmissible under Rule 702 and, even if admitted, still does not support a *prima facie* case under any theory of liability. Even if one presumes that a fire started in a sump pump—more than a decade after it was sold—that is not proof that the product was defective when sold. The evidence is insufficient as a matter of Maryland law.

The manufacturer is entitled to summary judgment on all claims.

## RELEVANT FACTUAL BACKGROUND

### A. Wayne Water sump pumps reliably perform without causing fires; other devices in the insured's basement do not.

For decades, electric-powered submersible sump pumps have reliably—and safely—kept millions of American basements dry. Despite the product's long safety record, Plaintiff CSAA Affinity Insurance Company blames Defendant Wayne Water System's sump pump for causing a 2018 house fire. Among the various electronic devices found burned in the area near the fire's origin, only the sump pump manufacturer was then-identified. Yet, with discovery now closed, the insurance company and its experts have conspicuously failed to present any evidence that Defendant Wayne Water's sump pumps—or *any other* manufacturer's electric-powered sump pumps—have a history of causing fire or even overheating.

The lack of evidence that sump pumps cause fires is stark. Plaintiff's engineering expert, Christopher Graham, admitted that in the approximately 1,500 prior cases he has handled over the last decade, he had *never* attributed a fire's cause to a sump pump. Ex. 1, Graham Dep. at 12, 17-18. So Mr. Graham searched government websites for the Consumer Product Safety Commission, but there he found no safety recalls for *any* sump pumps. *Id.* at 30-32. In fact, with his expertise in engineering and fire safety, Mr. Graham had owned a Wayne Water sump pump without incident for many years in his own home. *Id.* at 40.

The history of the specific Wayne Water sump pump in the insured Bel Air, Maryland, home of Walter and Mary Mitchell makes it even more unlikely that it had a manufacturing or design defect that caused the fire. The Mitchells' pump, which the insurance company blames for the fire, had been operating properly for more than a decade, up through the morning of the fire. *See id.* at 159. Although Mr. Mitchell testified that the sump pump had been installed in the home since 1977, the sump pump's make/model number shows that it was manufactured between September 1999 and September 2004. This puts its manufacturing date at least thirteen years, and as many as eighteen years, before the 2018 fire. *Compare* Ex. 2, Mitchell Dep. at 25 *with* Ex. 3, Wayne Waters' Answers to First Set of Interrogatories.

**B.  The Fire and Related Investigations.**

The basement fire significantly damaged the Mitchells' home on April 25, 2018. That morning, before the fire, Mr. Mitchell heard the pump's motor running intermittently, as it should have been, after recent heavy rains. Ex. 2, Mitchell Dep. at 28-29; Fire Marshall Report at 28. The fire started (and firefighters extinguished it) shortly after Mr. Mitchell left the house. Fortunately, despite the significant property damage, no one was seriously injured, and the Mitchells had insurance coverage. So the insurance company paid the Mitchells $530,653.98 for their covered damages. *See* Am. Compl. ¶ 13.

House fires are virtually always investigated by State fire officials, who are most interested in (1) whether arson occurred and (2) where the fire originated. The Fire Marshal, Oliver Alkire, visited the fire scene the same morning it occurred with a trained canine to rule out arson and to determine where the fire originated. He later recalled that he was drawn to the corner where the pump was located because, when he arrived, the Mitchells told him that "maybe something had happened to their sump pump." Ex. 4, Alkire Dep. at 73. Then, after

briskly investigating the dim, flooded basement, the fire marshal found no evidence of arson and, "at the time," believed that the fire probably started in the basement near the sump pump. *Id*. at 86, 90.

But he later admitted that he had not fully considered whether the fire originated from the other nearby devices, which are well-known to cause fires. *Id*. at 53, 55-56, 88-89. Alkire conceded that he had *not* examined any other electrical device at all, including several in the basement's bathroom. *Id*. at 53-56. He later conceded that the ceiling on the bathroom had more extensive charring than that in the sump-pump corner, which, Alkire testified, is a "good indicator" for the area of origin. *Id*. at 26, 52.



Fig 1: Photos of the ceiling joists in the corner containing the sump pump (left) and joists above the bathroom (right). Andrew Schlegel Photos 5-15-18.

Soon after the fire marshal's investigation, the insurance company conducted its own investigation. *See* Am. Compl. ¶ 14. Why? Money. Insurers can recoup some or even all of the money that they pay to their policyholders if they can prove that an identifiable (and financially solvent) third-party negligently caused the fire. Or they can extract a settlement by simply suing a manufacturer who wants to avoid the risk and expense of protracted litigation. A successful subrogation claim makes the third party liable for the loss and, if paid, shifts the entire loss away

from the insurance company. *See*, *e.g.*, *AIG Prop. Cas. Co. v. Eaton Corp.*, No. JKB-18-1853, 2019 U.S. Dist. LEXIS 63675, at *13-14 (D. Md. Apr. 12, 2019).

The insurance company's fire experts were the first to identify multiple electrical devices in the basement beyond the sump pump in question—including a power strip (a/k/a relocatable power tap or RPT), exhaust fan, light fixture, and space heater—as potential *causes* of the fire. All were in or near the basement's severely charred bathroom. And all have well-documented histories of overheating and causing house fires. Plaintiff's engineering expert Mr. Graham even testified that he "vehemently agree[s]" with Defendant's expert Mr. Peck that power strips "are well-known causes of fires and result in thousands of fires." Ex. 1, Graham Dep. at 154. But the manufacturer for each of these hazardous devices could not be readily identified.



Fig. 2: Photos depicting the remnants of various electrical devices in or near the basement's bathroom, including a light fixture, an exhaust fan, and a relocatable power tap.  Chris Graham Photos – 5-15-18

6

Only the sump pump could be tied to a specific manufacturer: Defendant Wayne Water. To no one's surprise, the insurance company's experts ultimately concluded that the sump pump malfunctioned and caused the fire.

Much of the insurance company's investigation occurred before Defendant was even aware of the fire and potential claim against it. Plaintiff's fire investigation expert, Andrew F. Schlegel, examined the property two days after the fire. Ex. 5, Schlegel Report. A few weeks later, on May 15, Plaintiff's electrical engineering expert, Christopher Graham, met Mr. Schlegel and examined the property, which was under Plaintiff's exclusive control. Ex. 6, Graham Report. During this site visit, he examined the sump pump and it was ultimately taken to his laboratory, where he held it for the next year.

Defendant Wayne Water first received notice of the potential claim on June 6, 2018. Little information was then provided, and Plaintiff did little to supplement until it scheduled an inspection of the pump that October, when it was inspected twice. First, on October 23, Plaintiff's experts and Wayne Water representatives inspected the pump. Inexplicably, two days later—without anyone from Wayne Water present—Graham and his assistant Oscar Zalamia re-inspected the pump and took photographs that would be used and relied on in Graham's report. Ex. 1, Graham Dep. at 68-69; Ex. 7, Zalamia Dep. at 49-50. Graham wanted photographs showing that the electrical motor's windings retained their varnish, which, Graham insisted, meant the fire was not caused by "an overheat of the motor itself." Ex. 1, Graham Dep. at 70-71.

At no point in 2018 did Plaintiff notify Wayne that it believed that the pump was defective. It was only three years later—when this suit was filed in 2021—that Defendant Wayne Water learned that the insurance company believed that the pump was defective and that the

7

defect caused the fire. But even then, Plaintiff's original complaint simply stated that the pump "malfunctioned, failed and caught fire[.]" Compl. ¶ 2.

**C. Plaintiff's destruction of the most relevant evidence before filing lawsuit in 2021.**

The insurance company's case—and Wayne Water's defense—turns on the quality of evidence that the sump pump had (1) a *defect* that (2) *caused* the fire, instead of the pump merely being burned *in* the fire. The claims and defenses similarly turn on evidence that the power strip or other more dangerous devices in the Mitchells' basement (or anything else) did *not* cause the fire. But the insurance company destroyed the pump and the other electrical devices found in the basement near the pump. And it did so before filing this lawsuit and before even notifying Wayne Water that it believed that the pump was defective and that its "defect" caused the fire.

The Insurance company destroyed the pump in 2019—after its engineering expert had taken the pump from the insured property and held it for more than a year for this litigation. *See* Ex. 8, Disposal Authorization Form. The other devices were destroyed even earlier. The insurance company's engineering expert testified that his company, Evidence Management Center, destroyed the pump that is at the heart of this lawsuit because the insurance company expressly authorized him to do so. *Id. See also* Ex. 1, Graham Dep. at 55-57. Defendant's experts, thus, are left with only pictures to try to conceptually re-create how the fire started.

Plaintiff's amended complaint alleges that the pump "malfunctioned" causing fire. Am. Compl. ¶ 9. It alleges that the "fire occurred due to an overheating event internal to the sump pump located at the contacts for the off/on switch." *Id.* ¶ 10. It adds that "due to repeated activation, the switch overheated, melted its covering, arced, spit out molten copper and ignited the nearby combustibles." *Id.*

The three-count amended complaint alleges strict liability, negligence, and breach of implied warranties. Count I asserts strict liability for selling a "defective" and "unreasonably dangerous" pump that allegedly caused fire. It alleges defective design, failure to warn, and manufacturing defects. *Id*. ¶ 19. But it equivocates that the "defect in the sump pump is indeterminate" under Maryland law. *Id*. ¶ 21. Count II alleges negligence under the same three theories: design defect, manufacturing defect, and failure to warn. *Id*. ¶ 25. Count III alleges breach of implied warranties of merchantability and fitness for a particular purpose. But the implied-warranty allegations do not allege that the homeowners bought their pump for any *particular* purpose—other than what an ordinary purchaser would intend—or that anyone else knew of the homeowners' undisclosed particular purpose.

### D.  Plaintiff's expert's theory of product defect and liability

Leveraging the fire marshal's view that the basement fire originated at the sump pump, the insurance company's fire expert, Mr. Schlegel, has proffered essentially the same opinion on where the fire started. But that is not enough to shift the insurance company's subrogated loss to the pump manufacturer. The insurance company needs admissible expert testimony that the pump (1) had a defect *when sold* that (2) caused the fire. For this necessary opinion testimony, the insurance company proffers Mr. Christopher Graham, an electrical engineer, who wants to tell jurors that the pump—more than a decade after it was sold—overheated and caused the fire.

But his opinion is little more than a series of educated guesses. As a threshold matter, it cannot support failure-to-warn or design-defect claims. His report and testimony never even *address* the failure-to-warn claims, and Mr. Graham agreed at deposition that the purported cause of this fire was *not* "a flaw in the design of the pump." *See* Ex. 1, Graham Dep. at 96. So he is left to argue that the pump had a manufacturing defect when sold. At deposition, he agreed

that he was opining that the pump had "an error in manufacturing which caused an area of high resistances." *Id*. at 97.

Applying the general principles that (1) a high-resistance electrical connection or contact can generate heat and (2) metals and plastics have melting points, Mr. Graham suspects that the burned and now-destroyed pump had high resistance at either its connections or its contacts at its float switch. He further suspects that molten metal (or possibly plastic) somewhere near the switch dripped from the pump and ignited unspecified combustible material. Ex. 1, Graham Dep. at 122-123; Ex. 6, Graham Report at 14.

There is much that Mr. Graham admittedly does not know. Most crucially, he does not know which part of the pump purportedly overheated. He surmises that it was the connectors *or* the contacts by the float switch. But he testified, "**I can't tell**" and "**I do not know** if it was at contacts or the connection that was connected to the switch." Ex. 1, Graham Dep. at 97:19-99:12.

After briefly pondering that the pump's connections may have corroded over time (and which would not be indicative of a defect leading to liability here), prompting counsel to ask whether that was his opinion here, Mr. Graham answered, "**I don't know**. That's possible." *Id*. at 162. He also does not know if the purportedly molten metal was bronze or brass or tinplated copper or how quickly such metals cool when molten droplets fall from the heat source. *Id*. at 94, 125-126.

Mr. Graham fundamentally does not know whether his hypothesis of the Wayne Water sump pump defect and overheating is viable because the insurance company has not paid him to *test* any of his hypotheses to find out. Mr. Graham did not obtain a Wayne Water pump or any other sump pump to test its contacts and connections and measure their temperature during use or misuse. *See id.* at 118-19. He did not perform any tests for this case—and, in 1,500 prior

cases, he has never blamed a sump pump for causing a fire. *See id*. at 17-18, 118. He testified

that the plastic that housed the pump's float switch "did not appear to be [fire-resistant]

thermosetting plastic." *Id*. at 128. But he does not know what kind of plastic Wayne Water

pumps used or test any plastics for flammability. *Id*. at 130. He did not test whether housing the

switch with steel instead of plastic would have prevented or reduced a fire hazard or what

temperature was needed to melt the switch or its connections. *Id*. at 131.

Instead, Mr. Graham vaguely refers to things he has "tested in the past" or "just general

testing" that he "tested for other cases"—all of which he admits are *no longer available*—as

supportive of his hypotheses. *Id.* at 125. He glazes over the inadequacy of such testimony with

the breezy, meaningless assurances that one can "find similar testing on YouTube" and that he

"could recreate the test." *Id.* at 125-26. But none of this testing was included in his report or

provided in any addendum later in discovery. Regarding melting, he testified, "I do not have to

conduct any tests to determine how the melting was generated." *Id.* at 119.

Finally, Mr. Graham also failed to preserve and test in his lab the *other* electrical devices

near the sump pump—even though all were present when he examined the scene on May 15.

This is unusual, as Graham's own assistant Zalamia testified that they normally investigate

"more than one item" from the same fire in the lab to ascertain cause. Ex. 7, Zalamia Dep. at 21.

But this investigation was not normal. No other electronic device was collected and

tested, despite each device exhibiting significant fire destruction. *See supra* Fig. 2 on Pg. 6.

Graham testified that the power strip recovered from the basement was never inspected in his lab

and he does not know where it went. Ex. 1, Graham Dep. at 134. Although Mr. Graham's report

identified the exhaust fan as a potential fire source that he had ruled out as the cause, it never

mentioned the power strip on the wall near the sump pump or the space heater in bathroom as

devices that he had considered and ruled out. *Id*. at 58-59. And not one of those devices was inspected in his lab.

## RELEVANT LEGAL STANDARDS

### I.    Rule 37 prescribes necessary sanctions for evidence spoliation.

Federal Rule of Civil Procedure 37 and the Court's inherent power each authorize sanctions for spoliation, which is the "destruction or material alteration of evidence . . . or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. GMC*, 271 F.3d 583, 590 (4th Cir. 2001); *see* Fed. R. Civ. P. 37; *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-46 (1991); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 516 (D. Md. 2010). The Fourth Circuit does not condition spoliation sanctions on a showing of bad faith—only a showing of "some degree of fault," with the degree of fault often affecting the sanction imposed. *Silvestri*, 271 F.3d at 590. Although "dismissal should be avoided if a lesser sanction will perform the necessary function," it "may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case." *Id.* at 590, 593; *see also Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 708 (D. Md. 2009); *King v. Am. Power Conversion Corp.*, 181 F. App'x 373, 377-78 (4th Cir. 2006).

### II.    Rule 702 requires reliable expert testimony that would assist the jury.

The Fourth Circuit emphasizes that the risk to the judicial process from admitting unreliable expert testimony "is notably amplified in products liability cases, for expert witnesses necessarily may play a significant part in establishing or refuting liability." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (cleaned up). Trial courts must ensure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 states:

> A properly qualified expert witness may testify the form of an opinion or otherwise under Federal Rule of Evidence 702 if:
>
> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) the testimony is based on sufficient facts or data;
>
> c) the testimony is the product of reliable principles and methods; and
>
> d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702. In its evidentiary gatekeeping role, the Court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

*Daubert* articulated several relevant factors regarding the reliability of an expert's reasoning or methodology: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (2001) (*citing Daubert*, 509 U.S. at 593-94).

Conversely, an expert's opinion will be inadmissible if it relies on "assumptions which are speculative and not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994). The Supreme Court instructs that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Thus, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*.

### III.     Rule 56 requires judgment against parties who lack sufficient proof.

Summary judgment is governed by Rule 56(a), which provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, the party opposing the motion cannot merely identify the existence of *some* alleged factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). They must identify a factual dispute that is genuine and material. *Id.* Nor can the party opposing the motion "'rest upon the mere allegations or denials of [his] pleadings,' but rather must "set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former FRCP 56(e)). Nor can they prevail on the mere existence of a scintilla of evidence in support of their position. *Anderson*, 477 U.S. at 252.

## ARGUMENT

### I.     The insurance company's deliberate destruction of the pump and other electrical devices so prejudices Defendant that dismissal is necessary.

#### A.  The insurance company intentionally destroyed crucial evidence that it knew it was obligated to preserve for any subrogation action related to the fire.

The insurance company had control over the pump and other devices from the basement. It expressly authorized its retained litigation expert to destroy the pump more than a year after the fire. Although it had given Wayne Water notice of a potential claim, i.e., that a Wayne Water pump was in a fire under investigation, it destroyed the pump and other devices *before* notifying Wayne Water that it considered the pump defective and blamed the pump manufacturer for causing the fire.

The facts here easily meet spoliation's three elements of proof, which are:

14

(1) that the party having control over the evidence had an **obligation to preserve** it when it was destroyed or altered;

(2) the destruction or loss was accompanied by a **culpable state of mind**; and

(3) the evidence that was destroyed or altered was **relevant to the claims or defenses** of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F. Supp. 2d 673, 678 (D. Md. 2012) (emphasis added).

The insurance company cannot seriously contend that it had no obligation to preserve the pump that it ultimately blamed for the accident. Nor can it deny its duty to preserve the other electrical devices from the basement, especially those known to cause fires, like power strips, exhaust fans, and space heaters. The Fourth Circuit instructs that the "duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F. 3d at 591. And the duty of preservation extends to information that is relevant to the claims *or defenses* of *any* party, or which is "relevant to the subject matter involved in the action." *Cf. Goodman v. Praxair Servs.*, 632 F. Supp. 2d 494, 511-12 (D. Md. 2009) (quotation omitted).

The insurance company also cannot seriously argue that it lacked a culpable state of mind, which is not a high bar in spoliation cases. In the Fourth Circuit, "for a court to impose some form of sanctions for spoliation, *any fault*—be it bad faith, willfulness, gross negligence, or ordinary negligence—is a *sufficiently culpable* mindset." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529 (D. Md. 2010) (emphasis added). The insurance company is a sophisticated party, as is its experienced professional engineering consultant, who has handled at least 20 cases from *this* insurance company and knows that his primary—if not only—role for

15

the insurance company that hires him is to support its litigation efforts. *See* Ex. 1, Graham Dep. at 27. Mr. Graham's regular use of written authorization forms that require the insurance company or its lawyers to authorize any destruction of evidence in his facility bars any argument that the insurance company and its agents acted blamelessly here. *See* Ex. 8 Disposal Authorization Form.

The relevance of the destroyed material to the manufacturer's defense is obvious. The manufacturer needs to examine the pump *after* the insurance company notifies it that the pump was purportedly defective and caused the fire. Equally crucial to the manufacturer's fire-causation defense is its need to examine the electrical devices well known as hazardous that were near the sump pump. The pump and other electrical devices are the only direct evidence that could show how a product's defect started the fire.

**B. The insurance company cannot justify its spoliation of critical evidence.**

The plaintiff insurance company has offered no justification for its deliberate destruction of the sump pump and other electrical devices near it in the basement. Nor could it. The undisputed evidence is that the insurance company's testifying expert Mr. Graham was holding the pump at his lab until the insurance company authorized him to destroy it in 2019. And he testified that, when he inspected the basement in May 2018, he considered the other electrical devices as possible sources of the fire—but none were preserved for Wayne to test for itself. *See* Ex. 1, Graham Dep. at 58-59.

Defendant's representatives saw the pump only once after the fire, on October 23, 2018. That day, they were allowed into Mr. Graham's lab for a joint inspection of the pump, but they were not notified of the further inspection that Mr. Graham and his assistant performed two days

16

later. In that second inspection, they took photographs that are used in Mr. Graham's report to show the pump's "defect."

More crucially, at no point before destroying the pump and the other devices had the insurance company notified Wayne Water that it believed that the pump was defective or that the pump's purported defect(s) had caused the fire. Wayne Water had no idea what the insurance company's subrogation liability theory, if any, would be. It first learned that the insurance company blamed the pump supposed defectiveness for the fire in 2021, when the insurance company filed this lawsuit. Only then would the manufacturer be on notice that it needed to hire an electrical engineering expert to study both the pump and Mr. Graham's forthcoming causation opinion. And only then would the manufacturer know that it needed to hire experts to study the other devices and any other possible cause of the fire.

**C. Nothing less than dismissal would cure the extreme unfair prejudice to Defendant.**

The insurance company's indefensible spoliation has robbed the manufacturer of its ability to show either that (1) the pump did not cause the fire or (2) one of the other electrical devices in the basement did cause the fire. No lesser sanction than dismissal of the subrogation claim would be adequate to cure the unfair prejudice to Defendant. *See Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 708 (D. Md. 2009). By destroying the most crucial evidence in the case before alerting the pump manufacturer that it blamed the fire on the pump's purported manufacturing defect, the insurance company has bolstered its position in the case and deprived Wayne Water of its ability to meaningfully defend itself or develop persuasive alternative causation theories.

Presumably, the insurance company will concede its undeniable spoliation but argue for some sanction short of dismissal. It will likely argue that the record does not definitively prove

its *bad-faith* spoliation, as opposed to its willful or grossly negligent spoliation. *See Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008); *Goodman*, 632 F. Supp. 2d at 520. But Fourth Circuit law does not require bad faith to impose the sanction of dismissal if, as here, the spoliation denies the defendant "the ability to adequately defend its case." *Silvestri v. GMC*, 271 F.3d 583, 593 (4th Cir. 2001).

The *Silvestri* court instructs that "to justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude *either* (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." *Id*. (emphasis added). It rejected the plaintiff's argument that his products-liability case should not be dismissed for spoliation because he did not own or control the relevant evidence, a crashed car with an undeployed airbag, which a non-party insurance company sold months after the accident. *Silvestri* explained that "sometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness." *Id*. Refusing to accept the "unfairness inherent in allowing a party to destroy evidence and then to benefit from that conduct or omission," the court affirmed the dismissal for spoliation because the party had hired an expert to study the car in his contemplated litigation against the car manufacturer yet failed to preserve it. *Id*. (quoting *Kirkland v. New York City Housing Auth.*, 236 A.D.2d 170, 173 (N.Y. App. Div. 1997)).

The same principles apply with even greater force here, where the spoliator controlled the evidence yet still destroyed it before disclosing its liability theory to the defendant manufacturer. Plaintiff here did not merely fail to take steps to secure and preserve the crucial evidence owned by a non-party; it controlled, removed, and destroyed the electrical devices and expressly

18

authorized its expert, in writing, to destroy the pump. It did so years before filing its lawsuit or notifying the pump manufacturer that it blamed a pump defect for the fire. The insurance company may argue that the *Silvestri* defendant received no notice of a potential claim before spoliation but Wayne Water got notice of a potential claim in June 2018 and attended the October 23, 2018, joint inspection at Mr. Graham's lab. But this first step does virtually nothing to mitigate the extreme prejudice to Wayne Water because it would not prompt any reasonable manufacturer to hire an engineering expert to study either (1) the pump—a device with no history of causing fires—or (2) the other electrical devices—manufactured by *other* companies—that often cause fires. The pump manufacturer would retain relevant litigation experts only upon learning that the insurance company's engineer blames the fire on a purported defect in the pump. That did not happen until 2021.

Like the *Silvestri* plaintiff, the insurance company will likely argue that its own experts' photographs provide enough evidence for the manufacturer to adequately defend itself and prevent dismissal. Like the *Silvestri* plaintiff, it will be wrong because forcing a defendant manufacturer to "to rely on the evidence collected by [the plaintiff's] experts in lieu of what it could have collected would result in irreparable prejudice." *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 708 (D. Md. 2009) (quoting *Silvestri*, 271 F.3d at 594). The insurance company's agent, Oscar Zalamia, an assistant to Mr. Graham, took photographs of the sump pump at a *second* October examination on October 25, 2018, at Mr. Graham's lab. Mr. Graham used the photos in his report to support his causation and liability theory.

Wayne Water was not notified of this second examination before it occurred and had no opportunity to attend. And courts properly recognize that photographs and reports generated by an adverse party cannot replace an actual physical inspection of the damaged items. *See State*

*Farm Fire & Cas. Co. v. Frigidaire*, 146 F.R.D. 160, 163 (N.D. Ill. 1992). Once apprised of the

insurance company's theory of defect and liability, the pump manufacturer had no opportunity

for the "actual physical inspection of the damaged items," which is indispensable for a products-

liability defendant in a fire case.

Courts in this Circuit have repeatedly thrown out cases brought by insurance companies

and others who seek to blame fires on manufacturers but fail to preserve the evidence necessary

for the manufacturer to adequately defend itself. *See*, *e.g.*, *Silvestri*, 271 F.3d 583; *Erie Ins. Exch.*

*v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 708 (D. Md. 2009); *King v. Am. Power*

*Conversion Corp.*, 181 F. App'x 373, 377-78 (4th Cir. 2006). When, as here, "photographs and

other remaining evidence are inadequate to determine the condition of the electrical devices and

wiring near where the fire originated," the defendant "can neither rule out nor advance an

electrical theory of causation." *Erie Ins. Exch.*, 659 F. Supp. 2d at 708. Dismissal of the

subrogation claim is the only fair remedy for the manufacturer against the insurer.

**II.     The insurance company's experts have not proffered sufficient evidence of the
         defendant manufacturer's negligence or strict liability to support any claim.**

Although negligence, strict liability, and breach of implied warranties are distinct theories

of liability, "they all require proof that [1] the product was defective when it left the hands of the

manufacturer, and that [2] the defective condition was the predicate cause of the injuries or

damages of which the plaintiff complains." *Ford v. General Accident Ins. Co.,* 365 Md. 321, 335

(2001); *see McCoy v. Biomet Orthopedics, LLC*, No. ELH-12-1436, 2021 U.S. Dist. LEXIS

13716, at *58, 2021 WL 252556 (D. Md. Jan. 25, 2021); *Mohammad v. Toyota Motor Sales,*

*U.S.A., Inc.*, 179 Md. App. 693 (2008); *Harrison v. Bill Cairns Pontiac, Inc.*, 77 Md. App. 41

(1988). The *Harrison* court explained that to presume that "the manufacturer must be to blame"

when its product is directly involved in an unexplained fire accident "is not supported by

20

established principles of common-law negligence or strict liability or breach of warranty. It is simply wishful thinking." 77 Md. App. at 54 (quoting *Jensen*, 50 Md. App. 226, 234-35 (1981)).

The *Harrison* opinion, a controlling Maryland authority, is most instructive here. Like this case, it originated with an unexpected fire that damaged insured property (a car) and prompted litigation when the subrogated insurance company tried to try to pin its property loss on the manufacturer. The *Harrison* insurance company, like Plaintiff here, proffered vague expert testimony that fire originating under the dashboard proved that the five-year-old car's electrical wiring was defective under various negligence, strict liability, and warranty claims. And, like Mr. Graham, the insurance company's expert deduced defect from intense fire, testifying that "because all the wires were burnt and they were what was burnt most in the whole scenario, that is what I presumed was the central point of the fire" and "the only way that they would have caught on fire that way is through a short." *Id.* at 44.

The *Harrison* court affirmed summary judgment for the manufacturer, recognizing that "without any direct evidence of a defect in the electrical system of the vehicle in question, the plaintiffs rely only upon the supposition of one of their expert witnesses that such a fire would not normally result in the absence of a product defect." *Id.* at 52. The *Harrison* court recognized that a court might be able to infer defect when a *recently purchased* car catches fire during use. *Id.* But the *Harrison* car had been purchased more than a year before it caught fire. When products are bought more than a few months before a fire are alleged defective, the court cannot "infer from the happening of the fire not only that a defect existed, but that the alleged defect existed at the time of manufacture nearly five years before the accident." *Id.* Such reasoning is especially relevant for a product like the Mitchells' sump pump, which was manufactured somewhere between 13 to 18 years before the fire at the Mitchells' home.

Under controlling Maryland law, proof of a defect "must arise above surmise, conjecture or speculation." *Virgil v. "Kash N' Karry" Serv. Corp.*, 61 Md. App. 23, 32 (2005). The insurance company's "right to recovery may not rest on any presumption from the happening of an accident" and "[r]es ipsa loquitur does not apply." *Mohammad*, 179 Md. App. at 711. The insurance company and its engineering expert have been both unwilling and unable to advance their hypothesis that the pump was defective beyond mere speculation and presumption. They performed no tests on the pump in support of their theories and took no meaningful discovery of the defendant manufacturer or its experts. For this reason, not only is the opinion inadmissible but it also is insufficient, even if admitted, to state a *prima facie* case under any liability theory in this case. *See Harrison*, 77 Md. App. at 53-54. Defendant Wayne Water is entitled to summary judgment.

### A.   The insurance company's expert has withdrawn his design-defect opinion, which would have been inadequate in any event.

The insurance company has no design-defect claim because Mr. Graham agreed at deposition that the fire was *not* caused by "a flaw in the design of the pump." *See* Ex. 1, Graham Dep. at 96. That should suffice to enter judgment on the unspecified design defect alleged in the amended complaint. Yet, even if the court ignored that concession and the insurance company asked it to let it pursue a design-defect theory of liability, Plaintiff still lacks a *prima facie* case. *See Nissan Motor Co. v. Nave*, 129 Md. App. 90, 119 (1999). The *Nave* court explains that Maryland design-defect claims require proof of six elements when a product allegedly malfunctions:

> 1. The existence of an alternative design that is safer than the design used in the suspect product;
> 2. The technological feasibility of manufacturing a product with the alternative design at the time the suspect product was manufactured;

3. The availability of the materials required to produce the alternative design;

4. The cost of production of a product that incorporates the alternative design;

5. The price to the consumer of a product incorporating the alternative design; and

6. The chances of consumer acceptance of a model incorporating the plaintiff's suggested alternative design.

*Id*. Plaintiff has never proffered "an alternative design that is safer than the design used in the suspect product" or addressed the "technological feasibility of manufacturing a product with the alternative design at the time the suspect product was manufactured." *See id.* Nor has Plaintiff addressed the fourth, fifth, or sixth elements of the claim. With so many gaping holes in the design-defect claim, Defendant Wayne Water is entitled to judgment on all design-defect claims.

**B. The insurance company has not plausibly alleged a manufacturing defect.**

Although Mr. Graham and the insurance company ambiguously contend that some manufacturing defect exists in the Wayne Water pump that was burned in the Mitchell home, they have done virtually nothing to reliably support the hypothesis. Mr. Graham's speculation is inadmissible under Rule 702 and, even if admitted, insufficient to make a *prima facie* manufacturing-defect claim.

**1. Mr. Graham's manufacturing-defect opinions are inadmissible under Rule 702 for lack of fit and reliability.**

The only opinions that Mr. Graham has that are reasonably rooted in science and his expertise are the general principles that a high-resistance electrical connection or contact can generate heat and metals and plastics have melting points. These points are neither relevant nor helpful to a jury *unless* Mr. Graham or the insurance company have admissible expert testimony that these principles caused the specific pump in the Mitchells' basement to overheat and cause the fire. *See Daubert*, 509 U.S. at 591-92. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the *pertinent inquiry* as a precondition to admissibility." *Id*. (emphasis added). Because Plaintiff has no such testimony, Mr. Graham's non-speculative general-

23

causation opinions do not "fit" the case and are inadmissible. *See Basile Baumann Prost Cole & Assocs. v. BBP & Assocs. LLC*, No. WDQ-11-2478, 2012 U.S. Dist. LEXIS 103915, at *7 n.7 (D. Md. July 25, 2012).

Mr. Graham's specific opinions that the Mitchells' pump had a manufacturing defect near the float switch's contacts or connections lack a reliable basis. After merely hypothesizing that the pump was defective, Mr. Graham did almost nothing to reasonably test the hypothesis as true or false. He did not obtain a pump from Wayne Water to test the connections or contacts or show how they can become so overheated that they would cause a fire. And the insurance company took no discovery from the manufacturer or its experts to flesh out whether its hypothesis was borne out by the device's history and use. After Mr. Graham searched publicly available government websites and found *nothing* that indicated that Wayne Water sump pumps—or sump pumps generally—created any fire hazards, he and the insurance company stopped searching for ways to reasonably substantiate their hypothesis and rested on Mr. Graham's *ipse dixit*. His specific-causation testimony is unreliable and inadmissible under Rule 702.

**2.   Even if admitted, the Graham opinion does not meet the burden of proof.**

Mr. Graham's causation testimony is so perfunctory that, even if admitted, it would not establish a *prima facie* manufacturing-defect case. Like the expert in *Harrison v. Bill Cairns Pontiac, Inc.*, Mr. Graham wants to deduce a manufacturing defect from the fact that a product caught fire 13 to 18 years after it was manufactured. 77 Md. App. 41 (1988). And, like the *Harrison* expert, Mr. Graham admittedly does not know which part overheated and cannot testify to a reasonable degree of probability that (1) the contact overheated or (2) the connection(s) overheated. As in *Harrison*, the defendant manufacturer/seller is entitled to judgment as a matter of Maryland law, even without precluding the expert testimony.

Factual distinctions here make the case for summary judgment even more compelling. The *Harrison* expert at least knew with certainty that the fire started in the car dashboard and did not spread to the car from some nearby device with a known history of causing fires, like a power strip. There was no possible alternative source for a fire within a car dashboard than the car itself. And the pump here was not merely one year past its purchase date when it burned but more than a decade had passed since it left the manufacturer's control. The *Harrison* plaintiff also purchased the car directly from the defendant, something the insurance company has not established here. Even if the Court presumes that the fire started in the pump, countless things could have happened over the past decade or more to damage the pump while it was in the basement. *Harrison* protects manufacturers from such stale manufacturing-defect claims.

**C. The insurance company presented no evidence or expert testimony to support a failure-to-warn claim.**

Although the Amended Complaint includes failure-to-warn allegations in Counts I and II, the insurance company has not substantiated this claim and it should be dismissed. *See* Am. Compl. ¶ 19(g), 25(p). The insurance company has not identified any warnings that would have altered the outcome here. Nor did it even pursue discovery on the device's warnings. Of course, failure to warn presumes some *defect* in the product to begin with, which the insurance company has never substantiated, and that the manufacturer know of the defect. Manufacturers are "not liable when the failure to warn resulted from an absence of knowledge of the dangerous quality of that product." *Gourdine v. Crews*, 405 Md. 722, 741-42 (2008). Defendant is entitled to judgment on this abandoned claim.

25

**D. Without adequate proof of product defect, the insurance company cannot maintain its implied-warranty claims.**

The insurance company's failure to state a *prima facie* case of product liability defeats any warranty claim here.

**1. No warranty claim can proceed without evidence of product defect.**

The *Harrison* court properly held that a plaintiff's inability to state *prima facie* claims for products liability under negligence or strict liability theories leaves no room to claim breach of implied warranty. 77 Md. App. at 56. It explained that without "sufficient evidence of a defect, a breach of implied warranty of merchantability claim in a products liability case cannot be presented to a jury." *Id*. This requires judgment on the warranty claim if the products liability claims cannot proceed, for the reasons stated in Part II-A-C, *supra*. *See id*.

**2. The insurance company has not shown a breach of an implied warranty of merchantability or required notice of breach.**

Apart from the threshold barriers to brining any warranty claims, Arg. II.D.1, *supra*, Plaintiff has not stated a *prima facie* claim for breach of implied warranty of merchantability under Section 2-314 of Maryland's Commercial Code. First, "breach of implied warranty requires proof of a defect, attribution to the seller, and a causal relationship between the defect and the injury." *Conway v. Am. Med. Sys.*, Civil Action No. GLR-18-1466, 2021 U.S. Dist. LEXIS 246606, at *27 (D. Md. Dec. 28, 2021). Plaintiff has not made these required showings. Second, the UCC "requires a buyer to give notice to the seller for a breach of implied warranty." *Id*. (quoting *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011). "In Maryland, a lawsuit cannot constitute notice of a breach." *Id*. (cleaned up). Plaintiff has never even alleged notice to the seller or even that Wayne Water was the seller to the Mitchells. *See* Am. Compl. ¶ 11.

26

**3.  There is no alleged "particular purpose" or privity to even begin to allege breach of an implied warranty of fitness for a particular purpose.**

The insurance company also made a claim for breach of an implied warranty of *fitness for a particular purpose* but this claim fails as a matter of law. First, the claim requires direct privity between the plaintiff and defendant, something that the insurance company has not merely failed to allege but apparently even concedes that it lacks. It alleges that Defendant Wayne Water had "placed subject sump pump into the stream of commerce." Am. Compl. ¶ 11. Yet, downstream purchasers ordinarily cannot maintain this type of implied-warranty claim because the "warranty of fitness theory is usually not available against a remote manufacturer." *See Ford Motor Co. v. Gen. Accident Ins. Co.*, 365 Md. 321, 344 (2001).

Second, the insurance company simply ignores the fact that the "warranty of fitness sharply contrasts with the warranty of merchantability, which involves an inherent defect in the goods that existed before they left the hands of the manufacturer." *Id.* The *Ford Motor* court quoted the Official Comment to § 2-315's definition of a "particular purpose":

> A "particular purpose" **differs from the ordinary purpose** for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

*Ford Motor Co.*, 365 Md. at 348 n.24 (emphasis added). In other words, "the particular purpose must be distinguishable from the normal use of the goods; the purpose must be peculiar to the buyer as distinguished from the ordinary or general use to which the goods would be put by the ordinary buyer." *Id.*; *see also Bond v. NIBCO*, 96 Md. App. 127, 137-38 (1993). Direct privity is needed because the buyer must have a particular purpose *and* the seller must know of the particular purpose when making the sale. Neither requirement can be met here.

Here, the insurance company has asserted "no basis in law or fact to find any particular purpose in the present case, let alone that [Wayne Water] had knowledge of such a purpose on [the Mitchells'] part." *Ford Motor Co.*, 365 Md. at 350. Defendant is entitled to judgment.

## CONCLUSION

This Court understands that insurance is a business about managing and fairly allocating loss: "Subrogation is a matter of course in the insurance world. An insurance company that pays on its policies is entitled to sue on behalf of its insured, but the entitlement is conditioned on the company's ability to prove the cause of the damage." *See, e.g., AIG Prop. Cas. Co. v. Eaton Corp.*, No. JKB-18-1853, 2019 U.S. Dist. LEXIS 63675, at *13-14 (D. Md. Apr. 12, 2019). If an insurance company wants to shift its losses to a third-party manufacturer after paying on an insured loss, it needs to "prove the cause of the damage" and not simply file a lawsuit and lob an expert's vague accusations at a manufacturer to compel it to write a check.

The insurance company wants to be saved from its own business obligations without doing the necessary work to show that it is entitled to anything from this defendant. It wants to not only win its case but also do it on the cheap: without proper investigation, without preserving evidence, without testing its theories, and without pursuing any discovery. It wants to save its own time and money at the expense of everyone else's, including this Court's. Such cynical litigation tactics should not pay dividends. That is not the equitable loss-shifting that subrogation law is meant to provide. Defendant Wayne Water makes a safe product that has shown over time that it does not have a defect that causes fires. Nothing that the insurance company has done in this case has created a reasonable basis to doubt that. Because of the insurance company's (1) inexcusable spoliation and (2) failure to build a *prima facie* case, Defendant is entitled to summary judgment.

28

Dated this 5th day of July 2022

Respectfully submitted,

/s/ Thomas J. S. Waxter III
Thomas J. S. Waxter III (Bar No. 10388)
tjw@gdldlaw.com
Matthew H. Tranter (Bar No. 21389)
mtranter@gdldlaw.com
**Goodell, DeVries, Leech & Dann LLP**
One South Street, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 783-4000
Fax: (410) 783-4040
***Attorneys for Defendant***
***Wayne/Scott Fetzer Company d/b/a Wayne Water***
***Systems (incorrectly identified as The Scott***
***Fetzer Company in the Complaint)***

4890-0653-3927, v. 1