**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CSAA AFFINITY INSURANCE COMPANY a/s/o WALTER & MARY MITCHELL, | * |
| | * |
| Plaintiff, | |
| | * Case No.:  1:21-cv-01543-JKB |
| v. | |
| | * |
| THE SCOTT FETZER COMPANY a/k/a WAYNE/SCOTT FETZER COMPANY, d/b/a WAYNE WATER SYSTEMS | * |
| | * |
| Defendant. | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S
MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AND MOTION
FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

In its motion, Defendant seeks to avoid responsibility for the damage caused when its sump pump malfunctioned, caught on fire, and the fire spread to the basement and home of CSAA's insured.   By hiding behind a claim that evidence far away from the independently determined area of origin was not preserved and by challenging the admissibility of CSAA's expert's opinion, Defendant attempts to remove the harsh spotlight from its faulty design.  For all the reasons set forth below, Defendant's litigation tactic should be rejected, and summary judgment denied.

## II.      COUNTER-STATEMENT OF FACTS

### Background

On August 25, 2017, a Wayne Water submersible sump pump, Model FLP50-NPL, malfunctioned and started a fire in the basement of property owned by CSAA's insured,

Walter and Mary Mitchell, in Bel Air, MD.  CSAA paid $520,653.98 for the damages sustained and became subrogated to any and all claims its insured had against the responsible party.

### Investigation

Maryland State Fire Marshal, Oliver Alkire, was the first fire investigator at the scene. He arrived while suppression efforts were winding down. He inspected the damage, photographed the scene, interviewed several witnesses and issued a report.  Based on the unique fire patterns, particularly a "V" like pattern, Fire Marshal Alkire placed the origin of the fire in the northeast corner of the basement where he discovered the sump pump. State Fire Marshal Alkire concluded:

> With these observations, I determined the point of origin.  I concluded the fire originated after the sump pump mechanical motor failed, ceased and subsequently sparked the interior of the box and the faux paneling.

See FM Alkire Report, p. 27, attached as **Exhibit "B"**.



Area of Origin

Sump Pump

CSAA also retained a cause and origin expert, Andrew Schlegal, and an electrical engineer, Christopher Graham, to inspect the fire scene.  These experts did NOT speak with Fire Marshal Alkire or have knowledge or access to his conclusions prior to rendering their own. (See 3/39/22 Schlegal dep.: 132:12-19, **Exhibit "C"** and 4/5/22 Graham dep., 146:2-20, **Exhibit "D"**) Independently, Experts Schlegal and Graham reached the same conclusion as the Fire Marshal- the fire originated at the sump pump.   (See Schlegal Report, **Exhibit "E"** and Graham Report, **Exhibit "F"**)

As part of his process, Mr. Graham examined and ruled out as potential causes other electrical devices/appliances which were outside the area of origin defined by Fire Marshal Alkire and by Experts Schlegal and Graham's own investigation including a power tap, space heater and bathroom exhaust fan. (See p. 58:8-20, **Exhibit "D", p. 102:21-104:12**) Experts Schlegal and Graham extensively photographed the basement fire scene and harvested the sump pump for identification and a future laboratory exam. (See Chain of Custody, **Exhibit "G"**) No other artifact was taken from the scene, as the area of origin and cause were clear to CSAA's experts (and the Fire Marshal).

### **The Sump Pump**

The subject sump pump is powered by electrical energy.  It is partially submersible meaning the pump motor was above floor level, while the remainder was below ground. A metal rod had a float affixed on one end (the bottom) and was attached to a movable plastic arm connected to the switch on the other (the top).  The rod moves up and down depending on the water level.  When the level reaches a high setpoint, the switch actuates, turning the pump on and lowering the water level.  When the desired low level of water is achieved, the switch "opens" and the motor turns off.   The switch is covered by a plastic

housing.  The pump has a cord which is plugged into a nearby receptacle.  (See p. 9, **Exhibit "F"**)

**August 9, 2018**

The manufacturer of the sump pump was not readily identifiable at the scene, as the fire consumed its markings.  Thus, Defendant, Wayne Water was not immediately placed on notice of the loss and invited to the fire scene.  Based on a comparison with exemplar sump pumps, Mr. Graham determined the pump was manufactured by the Defendant.  (See p. 8, **Exhibit "F"**)



Exemplar

Remains of Sump Pump

Shortly thereafter, on August 8, 2018, Wayne Water was placed on notice of the loss, advised the fire was caused by a "failed unit" and invited to a joint laboratory examination of the pump. (See **Exhibit "A"**)

**The October 23, 2018 Examination**

On October 23, 2018, the joint laboratory examination of the sump pump took place.  Christopher Graham participated on behalf of CSAA. Mike Keilholz, compliance

engineer for Scott Fetzer/Wayne Water, Defendant, Don Williams, VP of Engineering for Scott Fetzer/Wayne Water, William Peck, Defendant's cause and origin expert, and defense counsel participated on behalf of Defendant. (See Sign in sheet, **Exhibit "H"**).   At the exam, Defendant choose whoever it wanted to attend, was afforded the opportunity to touch, photograph, examine, x-ray and thoroughly exam the sump pump at the exam.  (See Affidavit of Christopher Graham, **Exhibit "I"**)

The examination took place over 5 hours. At the conclusion of the October 23, 2018 examination, Defendant's representatives expressed no further interest in examining, testing or photographing the pump. (**Exhibit "I"**)

Defendant's representatives learned at the October 23, **_2018_** exam that the sump pump was the only evidence harvested from the fire scene. **(Exhibit "I"**)

### The October 25, 2018 photographs

On October 25, 2018, Oscar Zalamia, an electrical engineer working under the tutelage of Mr. Graham and who had been participated in the origin scene examination happened to be at the same laboratory where October 23, 2018 exam took place.  Mr. Graham suggested it would be a good idea and learning experience for Mr. Zalamia to look at and photograph the remains of the sump pump. (See 5/27/22 Zalamia dep., 26:16-27:5, **Exhibit "J"**) Mr. Zalamia did so and provided his photos to Mr. Graham.  (24:21-25-2, **Exhibit "J"**) Mr. Zalamia did not destructively examine the sump pump on this date. (36:8-15, 40:13-19, **Exhibit "J"**)

### The laboratory exam findings by CSAA's expert

In addition to the consumption of the plastic housing surround the switches, Mr. Graham found two of the three switch connections to be melted.



Melted Switch Connectors

According to Mr. Graham, the melting of the switches indicates an overheating event when electrical current ran through them (high resistance connection), causing electrical arcing and sparking at extreme temperatures (in excess of 2500° F), which in turn caused the breakdown of the switch plastic housing.  Molten metal from the switch and contacts expelled from and ignited the combustible materials in the vicinity of the pump.  Mr. Graham is also of the opinion that the two switches would NOT have the exhibited this type of damage had the fire been from an external attack.  (See p. 9-14 **Exhibit "F" and 87:5-7, 93:6-8, 94:20-96-8, 98:19-99:12, Exhibit "D"**)

**<u>September 6, 2019</u>**

On December 6, 2019, Evidence Management Center (EMC), the company with custody of the examined and photographed remains of the pump discarded the pump after receiving an executed release.[1]

---

[1] The signature on the release has not been identified.

Defendant has produced no report from an expert present at the destructive exam or otherwise who claims an inability to refute Mr. Graham's opinions because of lack of access to the pump remains.

### August 10, 2020

After the adjustment of the insured's 1st party claim, CSAA submitted a demand to Defendant.  In denying the claim, Defendant's counsel responded by correspondence and raised the spoliation issues which it waited until July 2022 to raise in the instant motion. (See **Exhibit "K"**)

### The Litigation

CSAA filed its complaint on April 19, 2021.  Defendant removed the case to federal court on June 22, 2021.  During the course of discovery, Defendant was provided hundreds of photographs of the fire scene and basement taken by CSAA's 1st party adjuster, experts Chris Graham, Andrew Schlegal and Oscar Zalamia. Defendant also subpoenaed and received the Fire Marshal's report and extensive photographs.  Based on those photographs and despite the fact that Defendant's representatives were not able to visit the fire scene before remediation and repairs were performed, Defendant's cause and origin expert, William Peck, was able to formulate an opinion and to fire origin. (**See Exhibit "L"**)

### Expert Opinion on Product Defect

Defendant either misunderstands and/or purposefully mischaracterizes the opinion of CSAA's electrical engineer, Mr. Graham. Plaintiff is NOT opining that the initial fire itself (the high resistance connection/short circuit at the switch contact or its connections) was caused by a manufacturing or design defect in the sump pump.  Rather, Mr. Graham's opinion is that the material used to construct the pump, and specifically the plastic used to

surround the switch contact and its connectors was a design flaw, such that when there was a high resistance connection in that area, the material was inadequate to contain the fire and prevent it from escaping the pump, igniting nearby combustibles and spreading throughout the basement.

Per CSAA's electrical engineer, had the design incorporated: 1) the use of the more robust thermoset plastic around the switch contact or 2) the use of steel housing, a better barrier would have been created to separate the molten materials from combustibles, and the fire would have been contained to the sump pump itself, not spread throughout the basements. The aforementioned technology and/or designs was feasible and available:

> The thermoset plastic I'm talking about has been resident in receptacles and breakers and panels since the 70s.
> . . .
>
> The term thermoset … as the plastic overheats, or is subject to heat, high heat, hundreds, hundreds of degrees, it starts to break down, but it retains its shape.  That's the set portion. In the case where high heat has been subjected to let's say breakers in a panel, … it's turned an ash, a white ashen, A-S-H-E-N, color.  And it holds its shape and integrity.
> . . .
>
> It's designed to retain heat and retain its shape so that heat and molten materials don't get expelled from it.

(See 95:20-96:8, 100:12-20, 128:3-129:14, **Exhibit "D"** and **Exhibit "F"**)

Notably, Wayne Water has offered no expert opinion commenting on this design flaw, the potential use of thermoset plastic or steel or their better fire containing properties.

## III.    ARGUMENT

### A.  Defendant's Motion for Sanctions fails because of its untimeliness

While Rule 37 does not contain a strict deadline for the filing of motions, courts who have considered the issue indicate it should be filed as soon as practical and identify a number of factors in assessing the timeliness of such motions:

> how long after the close of discovery the relevant spoliation motion has been made; (2) the temporal proximity between a spoliation motion and motions for summary judgment; (3) whether the spoliation motion was made on the eve of trial; and (4) the explanation of the moving party as to why the motion was not filed earlier should be considered.

*Al-Sabah v. Agbodjogbe*, No. ELH-17-730, 2019 WL 4447235, at *4 (D. Md. Sept. 17, 2019).   As noted by the court in *Goodman v. Praxair Servs., 632 F. Supp. 2d 494, 508 (D. Md. 2009)*:

> there is a particular need for these motions to be filed ***as soon as reasonably possible after discovery of the facts that underlie the motion***. This is because resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved. See, e.g., Silvestri, 271 F.3d at 594-95. Before ruling on a spoliation motion, a court may have to hold a hearing, and if spoliation is found, consideration of an appropriate remedy can involve determinations that may end the litigation or severely alter its course by striking pleadings, precluding proof of facts, foreclosing claims or defenses, or even granting a default judgment. And, in deciding a spoliation motion, the court may order that additional discovery take place either to develop facts needed to rule on the motion or to afford the party deprived of relevant evidence an additional opportunity to develop it from other sources. The least disruptive time to undertake this is during the discovery phase, not after it has closed.

> Reopening discovery, even if for a limited purpose, months after it has closed or after dispositive motions have been filed, or worse still, on the eve of trial, can completely disrupt the pretrial schedule, involve significant cost, and burden the court and parties. Courts are justifiably unsympathetic to litigants who, because of inattention, neglect, or purposeful delay aimed at achieving an unwarranted tactical advantage, attempt to reargue a substantive issue already ruled on by the court through the guise of a spoliation motion, or use such a motion to try to reopen or prolong discovery beyond the time allotted in the pretrial order.

(emphasis added)  *Id.*  Here, Defendant was aware as far back as ***August 2020*** (cite), if not earlier, (cite) of the issues it raises in the instant spoliation motion yet chose to wait until July 2022, AFTER the close of discovery,[2] to present them in this motion.

**B. The disposal of the sump pump remains after they had been thoroughly inspected, tested, deconstructed and photographed by Defendant's chosen representatives in a laboratory setting warrants no sanction.**

In arguing that the disposal of the sump pump remains on September 6, 2019 warrants a spoliation sanction, Defendant complains it had "no idea" CSAA was alleging the pump failed due to an electrical issue and therefore, Defendant was ostensibly deprived of an opportunity to hire an electrical engineer to examine the pump and rebut CSAA's defect theory.  That assertion is laughable.

Defendant ignores the fact that it was placed on notice of the fire loss on August 9, 2018, and advised that it involved a "failed" Wayne sump pump. (See **Exhibit "A"**) The notice letter was more than sufficient to identify for Defendant the type of experts necessary

---

[2] Per Order dated April 5, 2022, the discovery deadline passed on June 6, 2022.

to conduct a laboratory exam.   How else does an energized sump pump cause a fire other than an electrical failure?

Defendant also fails to acknowledge that its chosen representatives attended a laboratory examination on October 23, 2019 which was led by CSAA's ***electrical engineer,*** (**Exhibit "H")** (another clue as to CSAA's theory) and its representatives were afforded every opportunity to thoroughly inspect, test, deconstruct, X-ray, and photograph the subject sump pump.  (See **Exhibit "I"**) In fact, two of Defendant's representatives, Mike Keilholz and Don Williams, present at the laboratory exam are engineers. (See LinkedIn profiles for Mr. Williams and Mr. Keilholz, **Exhibit "M"**)

Further, Defendant has not identified or produced the report of an electrical engineer who is prepared to testify that the information learned, the observations made, the tests conducted and the photographs taken of the sump pump by Defendant's representatives on October 23, 2019 were insufficient to allow him to rebut the causation conclusion of CSAA's expert without reinspection and/or what benefit an additional laboratory examine was likely to produce.  Without this necessary opinion, Defendant can establish no prejudice.

Finally, Defendant take umbrage with the fact that an assistant to CSAA's electrical engineer, Oscar Zalamia, took additional photographs of the sump pump 2 days after the joint laboratory exam, and one of those photographs were used in CSAA's expert's report. Defendant also suggests an additional destructive exam took place at that time.  Again, Defendant's position is of no import.   First, there is no prohibition against one party taking as many photographs of the its own evidence either within or outside the presence of its adversary, as long as the photograph incorporated into the report was previously provided

11

to the adversary.  Here, Defendant does not dispute that all such photographs taken on October 25, 2019 were produced.

Next, Defendant is simply wrong in its position that any additional destructive activities were performed on October 25, 2019.  As Mr. Zalamia explained at his deposition, since he attended the fire scene exam but not the joint laboratory exam, but was at the same laboratory two days after the joint exam, CSAA's expert believed it would be a good learning experience to look at and photo the sump pump remains.  Mr. Zalamia confirmed he did NOT perform any additional destructive test on the remains. Thus, the photo images Mr. Zalamia was able to capture on October 25,2019 were equally available to Defendant's representatives two days earlier.

### C.  CSAA had no obligation to preserve "other electrical devices"

Defendant suggests that CSAA's expert, Christopher Graham, was required to harvest all electric devices in the basement of the Mitchell's residence and preserve them for future examination by Defendant, regardless of whether they were located within the zone of the fire origin or whether they exhibited any evidence of internal failure.  The duty which Defendant suggests is entirely overbroad.

In this case, not one, not two, but three investigators, Andy Schlegal, Christopher Graham and Fire Marshal Oliver Alkire, each examined the fire scene and independently reached the same conclusion- the fire originated in the northeast corner of the Mitchell's basement in the area of the Wayne Water sump pump. While it may be argued that Messrs. Schlegal and Graham are biased in favor of CSAA, the same cannot be said of the fire marshal.  He has no dog in this fight.  He is an impartial, neutral and unbiased observer and after his thorough examination concluded:

> With these observations, I determined the point of origin.  I concluded the fire originated after the mechanical motor failed, ceased and subsequently sparked the interior of the box and the faux paneling… The point of origin was determined to be the mechanical motor unit of the basement sump pump.[3]

(P. 27, **Exhibit "B"**).

Based on these findings, it comes as no surprise that the sump pump was the only item collected from the scene.  **There were no other electric devices in the defined area of origin**.

When confronted with the claim that proper fire investigation techniques require preservation of all electric devices showing any evidence of fire damage, regardless of location, Mr. Graham strenuously disagreed:

> If that statement was true, then it presupposes we should have collected the furnace, the water heater, all the wiring, and I got to tell you, that is not what is done, and that's not a good enough answer, not that's what's done. It's with ignition sources outside of the area of origin they can be evaluated on-site. And if they don't exhibit the -- that they're a source of the fire, then they're not collected. And certainly the water heater and furnace had soot deposition, had some fire damage, but they weren't taken they weren't taken because they weren't -- the water heater and furnace weren't taken because they weren't in the area of origin.  So I disagree that if the basic methodology, those items would have been preserved and tested.

(157:15-158:8, **Exhibit "D"**).

Defendant, however, wants to artificially expand the zone of origin (and with it the preservation obligation) beyond reason. According to Defendant, CSAA was obligated to preserve every electric device in the basement if it had any history of causing a prior fire

---

[3] While Mr. Graham disagree with Fire Marshal as to the why the sump pump ignited, he concurs with the conclusion of the origin.

anywhere and anytime, regardless of its location or its condition.  That simply is too burdensome and not the guidelines in the fire investigation industry, as testified by Mr. Graham.

**D.  A dismissal spoliation sanction is not warranted**

Assuming *arguendo*, this Honorable Court does find that evidence was spoliated, the sanction of dismissal is not warranted.  "Because of the extreme nature of dismissal as a sanction for spoliation, it is usually appropriate "only in circumstances of bad faith or other 'like action.'" *King v. Am. Power Conversion Corp.*, 181 F. App'x 373, 376 (4th Cir. 2006)(citing *Silvestri*, 271 F.3d at 593 (quoting *Cole v. Keller Indus., Inc.*, 132 F.3d 1044, 1047 (4th Cir. 1998))).  Further,

> "While a district court has broad discretion in choosing an appropriate sanction for spoliation,                'the applicable sanction should   be   molded   to   serve   the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" Id. Moreover,   "dismissal without deciding the merits is the most extreme sanction" and can only be used "after considering several factors," including:
>
> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Nautilus Ins. Co. v. Appalachian Power Co.*, No. 7:19-cv-00380, 2021 U.S. Dist. LEXIS 67965, at *5-6 (W.D. Va. Apr. 7, 2021) (citing *Shaffer*, 11 F.3d at 462-63; See also *Thompson   v.   United   States*, 219   F.R.D.   93,   101   (D.   Md.   2003)   and *Nautilus Ins. Co. v. Appalachian Power Co.*, No. 7:19-cv-00380, 2021 U.S. Dist. LEXIS

67965, at *5-6 (W.D. Va. Apr. 7, 2021).   Moreover, "When assessing what sanction to impose, courts consider the degree of culpability and the extent of the prejudice, if any."   A court must "impose the least harsh sanction that can provide an adequate remedy." *Membreno v. Atlanta Rest. Partners*, Case No. PX-19-0369, 13-14 (D. Md. Feb. 2, 2021)(citing *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, Inc., <u>803 F. Supp. 2d 469, 499-500</u> (E.D. Va. 2011) and  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010)).

Here, not only has CSAA and its experts acted in good faith at all times but Defendant, contrary to its protestations to the contrary, is able to and has established a robust defense focusing on an alternative area of origin.

### D.    Standard of Review-Summary Judgment

Under the Federal Rules of Civil Procedure, "summary judgment shall be awarded if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).   A genuine issue of disputed material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).   When considering a motion for summary judgment, the Court must determine whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  Id at 249.  A court must consider the facts and all reasonable

inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va*., 718 F.3d at 312; see also *Scott v. Harris*, 550 U.S. 372, 378 (2007).

      E.      **CSAA's design defect theory must survive summary judgment**

      Maryland law recognizes multiple theories of recovery for design defect cases, including strict liability and negligence. *Murphy v. Playtex Family Prods. Corp*., 176 F. Supp. 2d 473, 484 (D. Md. 2001). Under both strict liability and negligence theories, a plaintiff must show "three product litigation basics": (1) "defect;" (2) "attribution of defect to the seller;" and (3) "a causal relationship between the defect and the injury." *Parker v. Allentown, Inc*., 891 F. Supp. 2d 773, 780 (D. Md. 2012) (quoting *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 159, 949 A.2d 26 (2008)).

      To establish strict liability for a design defect under Maryland law, the plaintiff has the burden of proving that: (1) the product was in a defective condition at the time that it left the possession or control of the seller; (2) that it was unreasonably dangerous to the user or consumer; (3) that the defect was a cause of the injuries; and  (4) that the product was expected to and did reach the consumer without substantial change in its condition. *Phipps v. General Motors Corp*., 278 Md. 337, 363 A.2d 955, 958 (Md. 1976).

      To establish defectiveness, Maryland permits plaintiffs to invoke one of two tests: the consumer expectation test or the risk-utility test. *Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224, 228 (D. Md. 2011). Under the consumer expectation test, a plaintiff must show that the product was sold in a condition "not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." *Id.* (quoting *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 193, 792 A.2d 1145 (2002)). "Unreasonably dangerous" is defined as "dangerous to an extent beyond that which would be contemplated by the ordinary

consumer who purchases it with the ordinary knowledge common to the community as to its characteristics." *Halliday*, 368 Md. at 193.

The risk-utility test applies when a product malfunctions in some way, *Kelley v. R.G. Indus., Inc.*, 304 Md. 124, 138, 497 A.2d 1143 (1985), and "asks 'whether a manufacturer, knowing the risks inherent in the product, acted reasonably in putting it on the market,'" *Lloyd*, 275 F.R.D. at 229 (quoting *Ziegler v. Kawasaki Heavy Indus., Ltd.*, 74 Md. App. 613, 621, 539 A.2d 701 (1988).   Under the risk-utility test, a product is deemed defective "when the foreseeable risk of harm could have been reduced or avoided by the adoption of a reasonable alternative design." *Id.*; *see Ziegler*, 74 Md. App. at 620-21.  Specifically, the risk-utility test requires a seven-factor analysis:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions.
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Parker*, 891 F. Supp. 2d at 791 (citing *Klein v. Sears, Roebuck & Co.*, 92 Md. App. 477, 486, 608 A.2d 1276 (1992)); *Thompson v. Ethicon, Inc.*, No. SAG-19-03159l, 2020 U.S. Dist. LEXIS 121053, at *10 (D. Md. July 10, 2020).

Insofar as it is alleged that the sump pump malfunctioned, the test likely to be applied is the risk-utility test. Here, CSAA's expert, Christopher Graham, will offer testimony about the existence of feasible, alternative designs that would have reduced the foreseeable risk of harm to the Mitchells. Specifically, Mr. Graham opines that alternative, safer designs (use of thermoset plastic or steel for the housing covering the switch contacts and their connections) were available to Defendant without sacrificing utility. Defendant counters that Mr. Graham's opinions are both speculatory since he performed no testing on the efficacy of his proposed alternative design and flawed since he failed to perform a costs analysis.  Both of these arguments fail.

Under Federal Rule of Evidence 702, expert testimony is admissible if it will assist the trier of fact, and: (1) is "based on sufficient facts or data;" (2) is "the product of reliable principles and methods;" and (3) the principles and methods have been applied "reliably . . . to the facts of the case." Fed. R. Evid. 702. The expert testimony also must rest on a reliable foundation and must be relevant. *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

The role of the trial court is not to determine that the proffered expert testimony is irrefutable or certainly correct, *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596); see also Md. Cas. Co., 137 F.3d at 783 (noting that "[a]ll Daubert demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable . . . and helpful").

Defendant does not and cannot dispute that a high resistance connection (short circuit) at the switch contact or its connection is capable of generating high heat or that surrounding the contact with a material having the ability to withstand the heat without

erupting in flames is beneficial.  Likewise, Defendant does not and cannot dispute that the alternate materials proposed by Mr. Graham to surround the switch contact and connections have the capacity to contain a high heat fire.   No testing of this fact is necessary as it is the properties of steel and thermoset plastic are well known within the scientific community.[4]   The NFPA 921 states "[a] hypothesis can be tested either physically by conducting experiments or analytically by applying scientific principles in thought experiments." *Severn Peanut Co. v. Indus. Fumigant Co.*, No. 2:11-CV-14-BO, 2014 U.S. Dist. LEXIS 34507 (E.D.N.C. Mar. 15, 2014)(citing NFPA 921 § 4.3.6) Defendants have pointed to no controlling case law on point that mandates this Court to exclude  the experts' testimony because of the lack of testing. Mr. Graham is equipped with specialized education and professional experience to credibly opine on the alleged design flaw.

Next, it is important to note that after an alternative design is proposed, Defendant bears the initial burden of showing that the alternative designs were so costly that they were not feasible.  See e.g.   *Thompson v. Ethicon, Inc.*, No. SAG-19-03159l, 2020 U.S. Dist. LEXIS 121053, at *14 n.2 (D. Md. July 10, 2020).  Defendant has not met this initial burden. Defendant has produced no expert report speaking on this subject.  There is no counter evidence on lack of feasibility, unavailability of materials, excessive costs of production, or lack of acceptance in the marketplace.  This alone creates an issue of fact for which summary judgment must be denied.  *Id.*

---

[4] When questioned on the efficacy of the use of thermoset plastic or steel, Mr. Graham testified that, "there's sufficient authoritative dissemination of information on thermoset plastics, specifically on breakers and receptacles", that no additional testing on the heat retention properties were necessary.  (p130).

**F.    Summary Judgment on the Warranty Claims also Fails**[5]

The Fourth Circuit has explained that, under Maryland law:

> A warranty of merchantability is implied in the sale of goods by a merchant who deals in goods of that kind. To be merchantable, goods must "[p]ass without objection in the trade under the contract description" and must "be fit for the ordinary purpose for which such goods are used." Whether a good is merchantable also depends in part on usage of trade. This definition of merchantability incorporates trade quality standards and the consumer's reasonable expectations into the concept of merchantability. In the case of automobiles, the implied warranty of merchantability "not only warrants that the automobile will operate effectively, but that it will provide reasonably safe transportation."

*Robinson v. Am. Honda Motor Co*., 551 F.3d 218, 225 (4th Cir. 2009) (citations omitted). A seller who breaks this warranty is responsible to the person who sustains injury as a result. Md. Code Ann., Com. Law § 2-314 & cmt. 13. A "seller" includes "the manufacturer, distributor, dealer, wholesaler or other middleman or the retailer." Md. Code Ann., Com. Law § 2-314(1)(a).

A plaintiff must establish the following elements to recover for a breach of implied warranty of merchantability:  1) A warranty existed; and (2) The product did not conform to the warranty and thus the warranty was breached; and (3) The breach of warranty by the seller was the cause of the injury to the user or third party.  *Lloyd v. Gen. Motors Corp*., 397 Md. 108, 916 A.2d 257, 285-86 (Md. 2007).

Defendant argues that CSAA cannot meet the *prima facia* elements of this warranty claim because 1) it fails to establish a defect which caused plaintiff's injury and 2) the

---

[5] CSAA will voluntarily withdraw it count for breach of implied warranty of fitness for a particular purpose.

claim requires privity between the seller and buyer; and 3) Defendant was not promptly placed on notice of this claim.  All three arguments lack merit.

Having established a strict liability or negligence design defect theory, as set forth *supra*., CSAA can meet the *prima facia* elements of this claim and defeats Defendant's argument.  Next, Maryland has expressly waived the vertical privity requirement for a claim of breach of the implied warranty of merchantability, Md. Code Ann., Com. Law § 2-314(1)(b), defeating Defendant's second argument.  Finally, as to notice, on August 9, 2018, CSAA submitted formal notice of a fire caused by a malfunctioning Wayne Water sump**, Exhibit "A "**.  Certainly this letter, informed the seller of the breach, identified the particular goods that had been impaired, and set forth the nature of the nonconformity as required by Md. Code Ann., Com. Law § 2-607(3)(a).  *Doll v. Ford Motor Co*., 814 F. Supp. 2d 526, 542 (D. Md. 2011).

## IV.    CONCLUSION

For all the forgoing response, it is respectfully submitted that Defendant's Motion for Sanctions for Spoliation of Evidence and Motion for Summary judgment be DENIED.


Respectfully submitted,


/s/ WFA
_____
WILLIAM F. ALCARESE, JR., ESQUIRE
Alcarese Law, LLC
1301 York Road, Suite 200
Lutherville, Maryland 21093
T: (410) 299-8605
F: (410) 583-4706
bill@lawwfa.com
Local Counsel for Plaintiff

/s/ Robert Smolen
_____
ROBERT SMOLEN, ESQUIRE (Pro Hac Vice)
Gaul & Associates, P.C.
1650 Arch Street, Suite 1903
Philadelphia, PA  19103
T: (215) 563-6210
F: (215) 563-6274
rsmolen@law-gaul.com
Attorney for Plaintiff, admitted pro-hac vice

Dated:  August 2, 2022