IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **CSAA AFFINITY INSURANCE COMPANY,** | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-21-1543 |
| **THE SCOTT FETZER COMPANY,** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff CSAA Affinity Insurance Company ("CSAA") filed this subrogation action against Defendant Wayne/Scott Fetzer Company, d/b/a Wayne Water Systems ("Wayne Water") in the Circuit Court for Harford County, Maryland, seeking to recover damages incurred after a fire damaged the home of its insured, Walter and Mary Mitchell. (*See* Notice Removal, ECF No. 1.) CSAA claims that the fire damage was caused by a defective sump pump, manufactured by Wayne Water, in the basement of the Mitchells' home. (*See generally* Am. Compl., ECF No. 10.) Wayne Water removed the case to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1441 and 1332(a). (*See* Notice Removal.) Pending before the Court is Wayne Water's Motion for Sanctions for Spoliation of Evidence and for Summary Judgment. (ECF No. 32.) This Motion has been fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons stated below, the Court will grant Wayne Water's Motion to the extent that it seeks summary judgment, and will deny as moot its request for sanctions for spoliation.

## I. Background

On April 25, 2018, a fire occurred in the basement of the home of CSAA's insured, Walter and Mary Mitchell, in Bel Air, Maryland. (Fire Marshal R., Pl.'s Ex. B, ECF No. 35-3.) CSAA paid $520,653.98 for the damages sustained. (Pl.'s Br. Supp. Opp'n Mot. Sanctions and Summ. J. ("Pl.'s Br.") at 2, ECF No. 35-1.)

### A. Examination of the Fire Scene

Maryland State Fire Marshal Oliver Alkire investigated the incident while on duty in Hartford County on April 25, 2018. (Fire Marshal R. at 27.) Upon examining the burn patterns in the basement, he concluded that the fire originated at a sump pump that was located in a corner of the basement and enclosed in a wooden box. (*Id.* at 26–27.) He noted "extensive damage to the mechanical parts" of the sump pump as well as "to the wall studs behind the area where the pump and associated housing [of the pump] was in place." (*Id.* at 26.) He also noticed burn patterns in a bathroom adjoining the room that contained the sump pump that "were consistent with a fire entering [the bathroom] from the left." (*Id.*)

CSAA retained Andrew F. Schlegel of Donan Engineering Co., Inc. to determine the origin and cause of the fire. (Schlegel R. at 1, Def.'s Ex. 5, ECF No. 32-6.) Schlegel conducted a fire study of the Mitchells' house on April 27, 2018. (*Id.*) He had not spoken with the Fire Marshal prior to conducting his investigation and did not have knowledge of his opinions on the origins of the fire. (Schlegel Dep. at 132:12–22, Pl.'s Ex. C, ECF No. 35-4.) Schlegel determined that the "fire patterns [were] consistent with the location of the sump pump as the point of origin." (Schlegel R. at 5; *see also* Schlegel Dep. at 129:8–11 (testifying that the burn patterns showed that the fire originated at the box containing the sump pump and extended outward from there).) He

2

also observed that fire patterns were "consistent with the fire extension into the bathroom." (Schlegel R. at 5.)

CSAA also retained Christopher Graham, an electrical engineer with expertise in electrical failure and fire causation. (*See generally* Graham R., Def.'s Ex. 6, ECF No. 32-7.) Graham, with Schlegel present, investigated the fire scene on May 15, 2018. (*Id.* at 3.) Graham testified that he "originally thought the fire could be . . . from an area in the bathroom" but that he "looked at all the electrical ignition sources in the bathroom and was able to eliminate them." (Graham Dep. at 103:9–10, 104:10–12, Pl.'s Ex. D, ECF 35-5.) He examined and eliminated as the source of ignition "a power tap that was attached to a wall right outside the bathroom" and "a space heater that was in the bathroom," but did not include those items in his report. (Graham Dep. at 58:10–17, Def.'s Ex. 1, ECF No. 32-2.)

William L. Peck, Wayne Water's proffered expert witness in the investigation of fire cause and origin, (*see* Designation Expert Witnesses at 2, Def.'s Ex. D, ECF No. 36-4), reviewed photos of the fire scene. He stated that "[w]ithout an opportunity to inspect the fire scene and the failure of the Plaintiff[']s experts to document, test and preserve critical evidence from the area of the fire that sustained the longest burn time and most significant fire damage, it is nearly impossible . . . to establish the cause of this fire to any degree of scientific certainty." (Peck R. at 17, Def.'s Ex. C, ECF No. 36-3.) However, with the information he had, he opined that "the fire originated at the common wall between" the room where the sump pump was located and the bathroom, eleven feet from the sump pump. (*Id.* at 4.) He reached this conclusion based on the fact that the fire damage on this wall was "massive, with deep and heavy charring to the wall studs, the ceiling joist above and underside of the subfloor" which was comparatively more severe than the damage to the respective areas around the sump pump, indicating a longer burn time by the bathroom wall.

3

(*Id.* at 4–5.) He pointed to the electrical power strip that was attached to the wall outside of the bathroom that "sustained heavy fire damage," as well as "damage to the plugs and electrical cords that were plugged into it" and "[a]n extensively damage[d] electric heater [ ] to the left of the power strip" as possible causes of the fire. (*Id.* at 9–10.)[1]

### B. *Examination of the Sump Pump*

The sump pump itself was removed from the basement before either Schlegel or Graham investigated the scene. (*See* Fire Marshal R. at 26; Schlegel R. at 5; Graham Dep. at 92:8–16, ECF No. 35-5.) Evidence Management Center—a company owned by Graham—received the sump pump on May 15, 2018. (Graham Dep. at 55:19–21, ECF No. 32-2; Chain of Custody R., Pl.'s Ex. G, ECF No. 35-8.)

By letter dated August 9, 2018, CSAA notified Wayne Water that it was "investigating a fire loss that occurred in [its] insured's home involving a Wayne sump pump" and was "placing [Wayne Water] on notice of [CSAA's] subrogation interest in the [ ] loss and request to coordinate a joint inspection of the failed unit." (Pl.'s Ex. A, ECF No. 35-2.) On October 23, 2018, representatives of both parties jointly investigated the sump pump at Evidence Management Center's facility. (Sign in Sheet, Pl.'s Ex. H, ECF No. 35-9; Graham Dep. at 134:20–22, ECF No. 32-2; Graham R. at 8.) Graham participated in the examination on behalf of CSAA, along with Peck and other representatives of Wayne Water, including its Vice President of Engineering, a compliance engineer, and an attorney. (Sign in Sheet.)[2] Wayne Water identified the sump pump's

---

[1] The parties dispute whether these devices should have been preserved. Peck stated that the failure to preserve and test these items—specifically, the power strip, the electric heater, and the three electrical devices plugged into the power strip—did not comply with the "basic methodology of fire investigation outlined in NFPA 921[.]" (Peck R. at 11.) Graham disagreed with Peck's opinion that the "basic methodology of 921" was not followed because potential "ignition sources outside of the area of origin [ ] can be evaluated on-site" and "if they don't exhibit [ ] that they're a source of the fire, then they're not collected." (Graham Dep. at 157:11–12, 157:20–158:1, ECF No. 35-5.)

[2] Graham's associate Oscar Zalamia also took photos of the sump pump on October 25, 2023, which Graham used in his report. (Zalamia Dep. at 49:20–50:1, Def.'s Ex. 7, ECF No. 32-8; Graham Dep. at 68:15–69:3, ECF No. 32-2.)

4

date of manufacture as sometime between 1999 and 2004. (Def. Answers First Set Interrogs. at 3, Def.'s Ex. 3, ECF No. 32-4.)

Based on his examination of the sump pump, Graham opined that the fire was caused by a high resistance electrical connection that overheated in the switch at the top of the sump pump and set off a combustible material. (Graham Dep. at 95:3–16, 101:7–8, ECF 35-5.) He identified two parts of the switch where the overheating could have occurred: the switch contacts, which "open and close to permit or prevent current flow," or the connections, which "allow the switch to be connected to the motor windings." (*Id.* at 97:15–18, 99:6–7.) He opined that the resistance generated enough heat to combust the plastic housing around the switch, which then extended to the wooden box around the sump pump. (Graham Dep. at 123:6–14, ECF 32-2.)

Graham opined that "the failure to contain the overheat is the defect" because "[o]ver time[,] connections can get corroded and go bad," and appliances with connections should be designed "to prevent fire from occurring" or, in other words, the connections "need to be contained and not cause a fire." (Graham. Dep. at 161:20–162:2, 162:11–12, Def.'s Ex. A, ECF No. 36-1.) In his report, he identified two "reasonable alternative designs" that would have "significantly reduce[d] the fire hazard." (Graham R. at 14; *see also* Graham Dep. at 127:20–22, ECF 35-5 (stating that the alternative design "would have reduced the likelihood that a fire would have occurred from an overheated switch").) Namely, the "[u]se of thermoset plastic material around the switch sufficient to resist heat and molten metal transfer to exterior combustibles" or the "[u]se of steel housing to contain the switch and power connections which would act as a barrier to

---

Uncontradicted evidence shows that Zalamia did not clean the parts that he photographed or further disassemble the sump pump from the state it was left in after the October 23 joint examination. (Zalamia Dep. at 25:15–16, 36:14–15, Pl.'s Ex. J, ECF No. 35-11.)

5

separate molten metal from combustibles" would have "remove[d] the ignition source from the first material ignited." (Graham R. at 14.)

Graham opined that, "[b]ased on the appearance of the plastic that surrounded the switch, the remnants laying on the plate, it does not appear this was thermoset plastic," a material that is "designed to retain heat and retain its shape so that heat and molten materials don't get expelled from it." (Graham Dep. at 128:3–6, 129:12–14, ECF No. 35-5.) He added that thermoset plastic "has been resident in receptacles and breakers and panels since the [19]70s," but that he was not personally aware of any sump pumps manufactured around the time of the subject pump that used thermoset plastics. (*Id.* at 128:7–9, 130:12–131:4.)

Graham "did not do any testing on thermoset plastic for this case" because there is "sufficient authoritative dissemination of information on thermoset plastics specifically on breakers and receptacles." (*Id.* at 130:7–11.) He also did not conduct any testing to determine the temperature necessary for the switch to melt, but he knew "from previous work in switch connection of the melting temperatures" of bronze and brass, the type of material used in "contacts and electrical connections of this vintage, of this type of motor." (*Id.* at 131:13–21, 93:21–94:6.)

Peck disagreed with Graham's conclusions, in part because "[o]bservations of the pump revealed fire and heat damage to the outside with minimal damage to the interior." (Peck R. at 2.) He noted that "[t]he only combustible component on the pump's exterior is the hard plastic switch housing cover which is rated to withstand internal resistance heating and electrical arcing." (*Id.*) He therefore opined that the melting of the switch housing cover and components within was caused by "an external fire attack." (*Id.*)

The sump pump was discarded pursuant to an Evidence Management Center disposal authorization form signed and dated September 6, 2019. (Disposal Authorization Form, Def.'s

Ex. 8, ECF No. 32-9; Graham Dep. at 135:19–136:1, ECF No. 36-1.) The individual who signed the disposal authorization form has not been identified. (Graham Dep. at 136:3-14, ECF No. 36-1 (stating that he does not recognize the name).) Graham testified that Evidence Management Center "disposes of items according to the insurance company and their request to dispose of items" and would not dispose of a device without being instructed to do so by the insurance company. (Graham Dep. at 56:13–17, 57:1–5, ECF No. 32-2.)

CSAA, as subrogee of Walter and Mary Mitchell, initiated this lawsuit in April 2021. (Pl.'s Br. at 7.) After Wayne Water removed the case to this Court and moved to dismiss (ECF No. 7), CSAA filed an Amended Complaint asserting claims for strict liability, negligence, and breach of implied warranties. (ECF No. 10.) Discovery closed on June 6, 2022. (Scheduling Order, ECF No. 29.) Wayne Water filed the instant Motion on July 5, 2022. (ECF No. 32.) As to spoliation, it contends that CSAA's premature discarding of the sump pump, and failure to preserve other electrical devices from the fire scene, warrant dismissal of this case. (*See* Def.'s Mem. Supp. Mot. Sanctions and Summ. J. ("Def.'s Mem.") at 14–20, ECF 32-1.) It further argues that it is entitled to summary judgement on all claims because Graham's proffered expert opinion is inadmissible under Federal Rule of Evidence 702 or, even if admissible, is insufficient to carry CSAA's burden of proof. (*Id.* at 22–26; Def.'s Reply Supp. Mot. Sanctions and Summ. J. at 1–4, ECF No. 36.)

## II.  Legal Standards

### A.  Summary Judgment

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of a summary judgment motion, and any responses, by viewing all facts and making reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

### B. Rule 702

Federal Rule of Evidence 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court's role is to ensure "that an expert's testimony both rests on reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be

applied to the facts in issue." *Id.* at 592–93. This basic gatekeeping obligation applies to all expert testimony, not just scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

To be relevant, or helpful, an expert opinion must have a valid connection to the pertinent inquiry. *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019). To be reliable, an "expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). A district court enjoys wide latitude in determining what indicia of reliability are most relevant in a given case. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017). Those indicia may include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application; and (4) whether the theory or technique enjoys general acceptance within the relevant community.

*Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011) (quoting *Kumho Tire*, 526 U.S. at 149–50).

### III. Analysis

CSAA's Amended Complaint asserts products liability claims under theories of strict liability (Count I), negligence (Count II), and breach of an implied warranty of merchantability (Count III).[3] Because CSAA has failed to show that sufficient evidence in the record exists for a

---

[3] CSAA initially brought a claim for breach of implied warranty of fitness for a particular purpose, but stated in its Opposition to Wayne Water's Motion that it "voluntarily withdraw[s]" that count. (Pl.'s Br. at 20 n.5.) Indeed, there is no evidence that the Mitchells had a "particular purpose" that differs from the ordinary purpose of a sump pump. *See Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 374–75 (Md. 2001) (providing elements for breach of an implied warranty of fitness for a particular purpose).

9

jury to render a verdict in its favor, Wayne Water is entitled to summary judgement on all three Counts.[4]

Under Maryland law, a plaintiff must prove "three 'product litigation basics'—defect, attribution of defect to seller [or manufacturer], and a causal relationship between the defect and the injury—regardless of whether the theory of liability" is strict liability, negligence, or breach of implied warranty of merchantability. *Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 369 (Md. 2001); *Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773, 780 (D. Md. 2012). "A product defect can arise from the design of the product, a deficiency in its manufacture, or from the absence or inadequacy of instructions or warnings as to its safe and appropriate use." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 407 (D. Md. 2001) (citing *Simpson v. Standard Container Co.*, 527 A.2d 1337, 1339–40 (Md. Ct. Spec. App. 1987)). A design defect claim, specifically, "focuses upon the specifications for the construction of the product and the risks and benefits associated with that design." *Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 103 (D. Md. 2020) (quoting *Shreve*, 166 F. Supp. 2d at 411). "[T]he existence of a defect may be established through (1) 'direct proof based on the nature of the accident and the product involved'; (2) 'opinion testimony of an expert witness'; or (3) 'inference of a defect based on circumstantial evidence.'"

---

[4] Because the Court grants judgment in favor of Defendant Wayne Water and the case will not proceed to trial, it need not resolve Wayne Water's Motion for Sanctions for Spoliation. *See, e.g., Norton v. Gen. Motors LLC*, Civ. No. 4:19-329-SAL-KDW, 2020 WL 5948355, at *3 n.2 (D.S.C. June 16, 2020), *report and recommendation adopted*, Civ. No. 4:19-00329-SAL, 2020 WL 4218232 (D.S.C. July 23, 2020) (recommending defendant's motion for summary judgment be granted and not reaching issue of whether plaintiff's alleged spoliation of evidence would be ground for dismissal). The Court is skeptical, however, that Wayne Water has sustained its burden to show that it suffered extreme prejudice that would warrant dismissal. *See Fredeking v. Triad Aviation, Inc.*, No. 1:20-CV-612, 2022 WL 17850950, at *5 (M.D.N.C. Dec. 22, 2022) ("Dismissal of the action can be an appropriate sanction, even when loss of evidence was inadvertent or negligent, rather than willful, when the spoliation deprives 'the defendant [of] the ability to defend the claim.'" (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001))). Based on its examination of the sump pump before it was discarded, and photographs of the fire scene, Wayne Water is "not without a defense." *See Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F. Supp. 2d 673, 685 (D. Md. 2012) (holding party claiming spoliation had "not met his burden of showing extreme prejudice sufficient to warrant dismissal" in part because his fire origin expert "identified multiple potential sources of this electrical fault," none of which required the discarded items "in order to be persuasive").

*Parker*, 891 F. Supp. at 780 (quoting *Fireman's Fund Ins. Co.*, 767 F. Supp. 2d at 557). "Proof of any such defect 'must arise above surmise, conjecture or speculation.'" *Id.* (quoting *Virgil v. Kash N' Karry Serv. Corp.*, 484 A.2d 652, 657 (Md. Ct. Spec. App. 1984)).

Here, CSAA advances a single design defect theory: that "the material used to construct the pump, and specifically the plastic used to surround the switch contact and its connectors was a design flaw, such that when there was a high resistance connection in that area, the material was inadequate to contain the fire and prevent it from escaping the pump." (Pl.'s Br. at 7–8.)[5] To support this theory, CSAA points to the testimony and report of its engineering expert, Graham, opining that thermoset plastic or steel housing would have decreased the likelihood of the fire spreading beyond the sump pump. However, in the excerpt of Graham's deposition provided to the Court, when asked if he knew if the pump used thermoset plastic, Graham stated that "[b]ased on the appearance of the plastic that surrounded the switch, the remnants laying on the plate, it does not appear this was thermoset plastic of the types" he was referring to.[6] (Graham Dep. at 128:3–6, ECF No. 35-5; *see also* Graham Dep. at 123:6–7, ECF No. 32-2 (referring to "plastic housing" of the sump pump's switch).) CSAA has not pointed to evidence where Graham identified the material with any more specificity, or supported his conclusion that the housing material was defective with any testing or reference to industry standards or literature from the relevant field (beyond the general and vague reference to "sufficient authoritative dissemination

---

[5] CSAA's Amended Complaint also alleged the sump pump was defective based on its manufacturing and a failure to warn, (*see* ECF No. 10 ¶¶ 19, 25), but CSAA does not defend those claims here, and thus the Court will consider them abandoned. *See McCoy v. Biomet Orthopedics, LLC*, Civ. No. ELH-12-1436, 2021 WL 252556, at *28 (D. Md. Jan. 25, 2021) (granting summary judgment as to claims that plaintiff had abandoned by failing to address in its opposition to defendant's motion for summary judgment).

[6] Graham testified that there are "different levels of thermoset plastic" and the "thermoset plastic [he was] talking about has been resident in receptacles and breakers and panels since the [19]70's." (Graham Dep. at 128:6–9, ECF No. 35-5.) Graham did not further specify what level or type of thermoset plastic he was talking about in either the deposition transcript provided to the Court or his report. He further stated that "the appearance of the remnants did not appear to be thermosetting plastic in this case." (*Id.* at 128:9–11.)

11

of information on thermoset plastics specifically on breakers and receptacles." (Graham Dep. at 130:7–11, ECF No. 35-5.))

As the Fourth Circuit has emphasized, "a plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 290 (4th Cir. 2021) (quoting *Oglesby*, 190 F.3d at 249). This is because "[w]ithout testing, supporting literature in the pertinent field, peer reviewed publications, or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Id.* at 292 (brackets removed) (quoting *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019)).

Graham's testimony that the switch housing material "does not appear" to be thermoset plastic, and his failure to identify what material was used or its properties, renders his opinion as to the alleged design defect unreliable under *Daubert*. In *Oglesby*, for example, the Fourth Circuit affirmed the district court's exclusion of an expert opinion that was based in part on the assumption that an allegedly defective automobile part was made of "thermo-setting' plastic," which would mean the part could only have become misshapen while it was curing during the manufacturing process and not later, after it had left the manufacturer's control. 190 F.3d at 250–51. Like here, however, the expert admitted "that he did not know the type or composition of the plastic" and "did not ask the manufacturer," "analyze the part," "test it," or "apply any calculations," making his opinion unreliable. *Id.*

Nor did Graham point to industry standards or supporting literature to support the reliability of his opinion that the material used in the switch housing constituted a design defect that caused the fire to spread beyond the sump pump. *See Sardis*, 10 F.4th at 292 ("[A] failure to

cite industry standards can impact an expert opinion's reliability."); *Severn Peanut Co. v. Indus. Fumigant Co.*, Civ. No. 2:11-14-BO, 2014 WL 1056991, at *3 (E.D.N.C. Mar. 17, 2014) (admitting expert testimony where, in the absence of testing, the plaintiffs had "successfully shown that the experts' opinions [were] based on valid scientific principles which are sound and widely accepted," including by demonstrating that the hypothesized ignition source, phosphine gas produced by aluminum phosphide tablets, was "a recognized fire hazard in both scientific literature and in the fumigation industry," displayed EPA-required labels warning of a fire hazard, and was supported by "general academic acceptance"), *aff'd*, 807 F.3d 88 (4th Cir. 2015). Thus, the Court is left only with Graham's opinion that the use of an unspecified plastic material that "did not appear to be thermosetting plastic" failed to contain the fire. This opinion is too speculative to pass muster under *Daubert* and Rule 702.[7]

CSAA's contention that "Graham is equipped with specialized education and professional experience to credibly opine on the alleged design flaw" (Pl.'s Br. at 19) is not enough to render his opinion reliable. *See Sardis*, 10 F.4th at 290 (rejecting argument that because of an expert's "extensive credentials and 'unchallenged expertise,' his testimony satisfied *Daubert* and Rule 702"). As in *Sardis*, "while [Graham's] 'theory is plausible and may even be right, it is no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the

---

[7] Wayne Water also challenged the reliability of Graham's opinion that the source of ignition was a high resistance connection in the sump pump's switch. (Def.'s Mem. at 23–24.) The Court need not resolve this issue because, even assuming this opinion would be admissible, proof that the sump pump was the ignition source does not establish that the sump pump was defective. (*See* Pl.'s Br. at 7 ("Plaintiff is NOT opining that the initial fire itself (the high resistance connection/short circuit at the switch contact or its connections) was caused by a manufacturing or design defect in the sump pump." (emphasis in original)).) Because CSAA has failed to produce admissible evidence establishing a defect in the sump pump, there is no genuine issue of material fact that would preclude summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" for which it "will bear the burden of proof at trial," "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

product of reliable principles and methods applied reliably to the facts of the case.'" *Id.* at 291 (additional quotation marks omitted) (quoting *Nease*, 848 F.3d at 232).

As proof of defect is an essential element that CSAA must prove under all three of its theories of liability, and Graham's testimony is the only evidence CSAA has supplied to establish a defect, sufficient evidence does not exist in the record for a reasonable jury to render a verdict in favor of CSAA. *See Celotex Corp v. Catrett*, 477 U.S. 317, 322–23 (1986). Accordingly, the Court will grant Wayne Water's Motion to the extent that it seeks summary judgment in its favor.

### IV. Conclusion

For the foregoing reasons, a separate order will issue granting in part Defendant Wayne Water's Motion (ECF No. 32) to the extent it seeks summary judgment. Its request for sanctions for spoliation will be denied as moot.

DATED this **30** day of March, 2023.

BY THE COURT:

_____
James K. Bredar
Chief Judge